[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 16-17623; 17-12163
_____

D.C. Docket No. 1:16-cv-24275-FAM

INVERSIONES Y PROCESADORA TROPICAL INPROTSA, S.A.,
a Costa Rican Corporation,

Plaintiff-Appellant,

versus

DEL MONTE INTERNATIONAL GMBH,
a Swiss Corporation,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 23, 2019)

Before MARCUS, BLACK and WALKER,[*] Circuit Judges.

BLACK, Circuit Judge:

Appellant Inversiones y Procesadora Tropical INPROTSA, S.A. (INPROTSA) appeals from the district court's orders denying its petition to vacate and confirming an international arbitral award issued in favor of Appellee Del Monte International GmbH (Del Monte). INPROTSA contends the district court lacked subject-matter jurisdiction over its petition to vacate the arbitral award, which Del Monte removed from state court. It further contends that, even if the district court had jurisdiction, the petition to vacate should not have been dismissed on the ground that INPROTSA failed to assert a valid defense under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention). Finally, INPROTSA contends the district court erred by granting Del Monte's motion to confirm the award. We affirm the district court.

## I. BACKGROUND

The MD-2 pineapple variety was developed by the Pineapple Research Institute of Hawaii (the Institute), an agricultural research organization that at one point was run jointly by Del Monte, the Dole Fruit Company (Dole), and the Maui Pineapple Company (Maui). Dole withdrew from the Institute before the MD-2

---

[*] Honorable John M. Walker, Jr., Circuit Judge for the United States Court of Appeals for the Second Circuit, sitting by designation.

was created.  And Maui, for its part, played little to no role in developing the MD-2.  Instead, the MD-2's commercial development was driven largely (if not solely) by Del Monte.  Del Monte initiated tests on the variety in 1980, released the variety to its Hawaiian operations in 1981, began selling the MD-2 in North America and Europe in 1987, and introduced the variety to Costa Rica in 1994, where it worked to adapt the MD-2 to that country's climate and conditions.  According to Del Monte, through its efforts, the MD-2 became the most popular pineapple variety in the world.

Del Monte did not, however, hold a patent on the MD-2.  And given the MD-2's commercial success, Del Monte was not the only pineapple producer interested in selling the variety.  Indeed, Dole commercialized the MD-2 in 2000, which prompted a federal lawsuit from Del Monte (the Dole Litigation).  Del Monte asserted claims for unfair competition, trade-secret violations, and conversion of vegetative material, alleging that Dole infringed its rights by—among other things—misappropriating knowledge and materials Del Monte developed in Costa Rica.

The Dole Litigation eventually settled in 2002 and, as a result, Del Monte acknowledged it did not have the exclusive right to sell the MD-2.  But before that settlement, while the Dole Litigation was pending, INPROTSA weighed offers from both Dole and Del Monte to begin producing the MD-2 at its Costa Rican

3

plantation.  In the end, INPROTSA chose to go with Del Monte, noting among

other factors that a ruling against Dole in the Dole Litigation might leave

INPROTSA without a market for its pineapples.

In May 2001, against that backdrop, INPROTSA and Del Monte entered into

an agreement (the Agreement) for the production, packaging, and sale of MD-2

pineapples.  Under the Agreement, Del Monte agreed to provide INPROTSA with

MD-2 seeds[1] at no cost.  INPROTSA, in turn, acknowledged that Del Monte

maintained ownership of all MD-2 seeds used on INPROTSA's plantation.

INPROTSA further agreed to grow, sell, package, and deliver MD-2 pineapples

exclusively to Del Monte.  The parties also stipulated that Del Monte was "the

exclusive owner of the variety known as MD-2," and they agreed that if the

Agreement were terminated for any reason, including its expiration, INPROTSA

would cease producing the MD-2 and either destroy its plant stock or return it to

Del Monte.

During the 12-year term of the Agreement, Del Monte provided tens of

millions of MD-2 seeds at no cost, and Del Monte purchased more than $200

million in pineapples from INPROTSA.  After the Agreement expired in 2013,

---

[1] Commercial pineapples are not grown from "seeds" in the ordinary sense of the word. They are grown by planting the leaves from the crown of the pineapple fruit or by planting seedlings that grow out of the pineapple plant's stem.  The term "pineapple seeds" thus refers collectively to crowns or seedlings that can be planted in the soil to produce new plants.  It is in this sense we use the term "seeds" in this Opinion.

however, INPROTSA neither destroyed nor returned its MD-2 plant stock to Del Monte. Instead, it sold the MD-2 pineapples to third parties.

Del Monte initiated an arbitration against INPROTSA in the International Court of Arbitration of the International Chamber of Commerce (ICC) in Miami. Del Monte alleged that INPROTSA breached the Agreement and converted its plant stock, for which Del Monte sought specific performance, injunctive relief, and damages. INPROTSA responded by arguing—among other things—that because Del Monte did not exclusively own the MD-2 variety, which INPROTSA contended was a condition precedent to its obligations under the Agreement, INPROTSA was not obligated to sell exclusively to Del Monte or return its MD-2 plant stock. INPROTSA also contended it was fraudulently induced to enter the Agreement by Del Monte's false representation that it had exclusive ownership of the MD-2 variety.

The arbitration tribunal issued its award (the Award) on June 10, 2016. In a thorough opinion, to which there was a dissent,[2] the tribunal ruled in favor of Del Monte on its claim that INPROTSA breached the Agreement. Specifically, the tribunal concluded that Del Monte's exclusive ownership of the MD-2 variety (as

---

[2] The dissenting arbitrator would have ruled that INPROTSA was no longer obligated to sell exclusively to Del Monte or cease its MD-2 production once Del Monte relinquished its claim to exclusive ownership of the MD-2 pineapple as part of the settlement in the Dole Litigation. The dissenting arbitrator also did not agree with either the majority's damages award or its grant of injunctive relief.

5

against third parties) was not a condition precedent to INPROTSA's contractual obligation to return or destroy the plants derived from seeds Del Monte provided at no cost under the Agreement. Thus, INPROTSA breached the Agreement by selling, rather than returning or destroying, the pineapples it derived from Del Monte's seeds.

Further, the tribunal rejected INPROTSA's contention that it was fraudulently induced to enter into the Agreement. After considering the evidence provided by the parties, the tribunal first determined that Del Monte's claim to exclusive ownership of the MD-2 was not fraudulent, because it was based on Del Monte's reasonable belief at the time that it had a proprietary interest grounded in its commercial development of the MD-2—regardless of whether it held a patent on the variety.[3] The fact that Del Monte subsequently renounced any broader rights to exclusive ownership of the MD-2 as against third parties did not render any prior representations knowingly false.

The tribunal also found that the Agreement's statement regarding exclusive ownership of the MD-2 was not a unilateral *representation* proffered by Del

---

[3] INPROTSA's arguments on appeal rely heavily on Magistrate Judge Simonton's conclusion, in the context of a discovery dispute in the Dole Litigation, that Del Monte sought to mislead growers in Costa Rica by sending out threatening letters implying it held a patent on the MD-2. *See* USDC Doc. 1 at 155–57. The tribunal specifically found, however, that "there is no evidence or allegation that Del Monte represented to INPROTSA that Del Monte held a patent or a trademark on the MD-2 hybrid." USDC Doc. 1 at 113. INPROTSA points to no record evidence refuting that finding.

6

Monte; rather, it was a joint *stipulation*, accepted as true by sophisticated parties with knowledge of both the pineapple industry and the contested nature of Del Monte's claim to a proprietary interest in the MD-2.  And even if it were a false representation, INPROTSA could not reasonably have relied on it because INPROTSA knew Del Monte's claim to exclusive ownership was contested when it entered into the Agreement.

Finally, the tribunal determined INPROTSA was aware of the falsity of any purported representation by at least 2002, after which INPROTSA ratified the Agreement:

> [INPROTSA] cannot blow cold and hot at the same time: enjoy the benefits of the Agreement for 12 years in which it never raised Del Monte's supposed fraudulent conduct, particularly after the Settlement Agreement putting an end to the [Dole] Litigation in 2002 . . . , but then seek to liberate itself under Florida law from contractual stipulations it freely and knowingly accepted to be bound by and enforce[d].

USDC Doc. 1 at 119–20.

The tribunal thus awarded Del Monte specific performance, injunctive relief, damages, interest, costs, and attorney's fees.  More specifically, it required INPROTSA to either return or destroy 93% of the MD-2 vegetative materials on its plantation—which the tribunal found were attributable to the seeds provided by Del Monte.  It also enjoined INPROTSA from selling 93% of its MD-2 pineapples to third parties until it complied with its obligation to destroy or return the MD-2

7

plant stock. With respect to damages, the tribunal determined that, under Florida law, Del Monte was entitled to disgorgement of the money INPROTSA received by selling the MD-2 pineapples to third parties in breach of the Agreement.

The tribunal recognized that the evidence on which a damages award might be fashioned was limited. Although it had evidence concerning INPROTSA's gross sales in 2014, it lacked any information concerning INPROTSA's sales in 2015. Likewise, because INPROTSA refused to provide any information about its profits or expenses during discovery, it was impossible to calculate an award based solely on the *profits* INPROTSA improperly obtained after the expiration of the Agreement. Thus, the tribunal concluded that, under the circumstances and evidence provided, Del Monte's damages should be limited to $26.133 million— 93% of INPROTSA's MD-2 sales in 2014. In other words, the tribunal refused to speculate about either INPROTSA's 2015 sales (which would have increased damages) or INPROTSA's expenses (which would have decreased damages).

INPROTSA promptly moved for correction and clarification of the Award under Article 35 of the ICC rules governing the arbitration, ostensibly seeking "to correct or clarify certain clerical, computational or typographical errors, or errors of a similar nature, contained in the Award."[4] USDC 1 at 190. INPROTSA

---

[4] The record does not appear to contain a copy of the ICC Arbitration Rules in force at the time. We note, however, that the current version of the ICC Arbitration Rules provides in Article 36(1) that "the arbitral tribunal may correct a clerical, computational or typographical

contended the tribunal's damages award was erroneous as a matter of Florida law because Del Monte did not prove the amount of INPROTSA's profits from the breach.  According to INPROTSA, because Del Monte provided evidence of only INPROTSA's revenues,[5] Del Monte's claim for damages should have been dismissed in its entirety.

The tribunal denied the motion, concluding it lacked authority to revisit the merits of its substantive damages award.  The tribunal reasoned that Article 35 of the governing ICC Arbitration Rules allowed only for interpretation of the Award or correction of errors of the clerical, computational, and typographical variety.  Article 35 did not provide authority to revise an Award on the merits, based on an alleged substantive error of law.

## II.  PROCEDURAL HISTORY

In September 2016, INPROTSA filed a petition to vacate the Award in Florida's Eleventh Judicial Circuit.  Del Monte then removed the petition to the United States District Court for the Southern District of Florida, citing 9 U.S.C.

---

error, or any errors of similar nature contained in an award."  ICC Arbitration Rules, http://iccwbo.org/dispute-resolution-services/arbitration/rules-of-arbitration/#article_36 (last visited Feb. 13, 2019).  We further note that INPROTSA later contended that the tribunal's power to correct the award was grounded in Article 36.  *See* USDC Doc. 70 at 7 ("ICC Article 36(2) explicitly granted the right to seek such a correction.").

[5] INPROTSA's motion for clarification did not address the tribunal's finding that INPROTSA refused to provide Del Monte with evidence of its expenses during discovery.  Nor did it explain why such a finding would not be relevant to Del Monte's purported burden to prove the amount of INPROTSA's profits under Florida law.

§§ 203 and 205, as well as 28 U.S.C. §§ 1331 and 1441.  Soon after, Del Monte filed a combined motion to dismiss the petition to vacate and cross-petition to confirm the Award.  INPROTSA, in turn, filed a motion to remand the proceeding to state court, contending the district court lacked subject-matter jurisdiction.

The district court granted Del Monte's motion to dismiss the petition to vacate and denied INPROTSA's motion to remand, reasoning that INPROTSA's petition to vacate—which was based on Florida law—failed to assert a valid defense under the Convention, as required by our opinion in *Industrial Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1446 (11th Cir. 1998).  The district court did not, however, expressly address Del Monte's cross-petition to confirm the Award.  As a result, there were some procedural detours that need not be recounted in detail here.  Ultimately, on limited remand from this Court, the district court granted Del Monte's cross-petition and confirmed the Award in a reasoned opinion.[6]

The district court concluded it had subject-matter jurisdiction under 9 U.S.C. § 203.  It then determined that INPROTSA failed to establish a valid ground for resisting confirmation under the Convention.[7]  Specifically, as is relevant to the

---

[6] Del Monte's motion to dismiss this appeal (Doc. 19), which is premised on the district court's purported failure to resolve its cross-petition, is therefore DENIED as moot.

[7] Alternatively, the district court ruled that INPROTSA was barred from asserting defenses to confirmation because it did not timely serve notice of its petition to vacate, as required under 9 U.S.C. § 12.

issues on appeal, the district court rejected INPROTSA's contention that the Award was procured through fraud. The district court first noted there were no arguments being raised that the arbitration process itself "was fraudulent, that the arbitration tribunal acted fraudulently, or that the final award was procured by fraud." USDC Doc. 47 at 9. It continued by noting that the tribunal reviewed the evidence submitted by INPROTSA and determined there was no fraud. INPROTSA could not avoid the Award simply because it disagreed with the arbitrator's conclusion on that issue. Otherwise, "any losing party raising a fraud defense in an international arbitration[] could relitigate the issue in federal court." *Id.* at 10. Such a result itself would violate this country's public policy favoring arbitration as an efficient means for resolving disputes. In the end, the district court concluded that "[t]he arbitration panel's consideration and ruling on the merits of INPROTSA's fraud defense does not violate the most basic notions of morality and justice requiring this Court to deny confirmation of the arbitral award." *Id.* (quotation omitted).

INPROTSA timely appealed the district court's orders both dismissing its petition to vacate the Award and granting Del Monte's cross-petition to confirm the Award.

11

### III.  DISCUSSION

*A.  Jurisdiction*[8]

INPROTSA contends the district court lacked subject-matter jurisdiction

over its petition to vacate.  Its argument is based on a narrow reading of 9 U.S.C.

§ 203, the jurisdictional provision in the statute implementing the Convention (the

Convention Act), which provides that "[a]n action or proceeding falling under the

Convention shall be deemed to arise under the laws and treaties of the United

States."  9 U.S.C. § 203.

According to INPROTSA, we have recognized only two causes of action

under the Convention—an action to compel arbitration and an action to confirm an

arbitral award.  *See Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279,

1286 (11th Cir. 2015) ("To implement the . . . Convention, the Convention Act

provides two causes of action in federal court for a party seeking to enforce

arbitration agreements covered by the . . . Convention: (1) an action to *compel*

*arbitration* in accord with the terms of the agreement, 9 U.S.C. § 206, and (2) at a

later stage, an action to *confirm an arbitral award* made pursuant to an arbitration

agreement, 9 U.S.C. § 207."); *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257,

1262–63 (11th Cir. 2011) (same); *Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d

---

[8] We review de novo issues concerning federal subject-matter jurisdiction.  *Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1363 (11th Cir. 2018).

1286, 1290–91 (11th Cir. 2004) (same).  Thus, INPROTSA contends, because a petition to vacate an arbitral award is not one of the causes of action expressly provided by the Convention Act, it cannot be "[a]n action or proceeding falling under the Convention."  9 U.S.C. § 203.  Consequently, a federal court cannot exercise subject-matter jurisdiction over a petition to vacate an arbitral award, even if the award itself falls under the Convention.

INPROTSA nevertheless concedes the district court had *removal* jurisdiction, because the subject matter of its petition to vacate "relates to an arbitration agreement or award falling under the Convention."  9 U.S.C. § 205.  But removal jurisdiction is not necessarily coterminous with subject-matter jurisdiction.  *See Cogdell v. Wyeth*, 366 F.3d 1245, 1248 (11th Cir. 2004).  Thus, INPROTSA contends we must distinguish between the purportedly narrow scope of subject-matter jurisdiction provided under § 203 and the broader scope of removal jurisdiction provided under § 205.  In other words, INPROTSA insists that, because Congress used different language in §§ 203 and 205, we must assume it intended to require federal courts to remand any "action[s] or proceeding[s]" removed under § 205 that are not covered under § 203, which INPROTSA contends is limited to those actions or proceedings expressly provided by the Convention Act.  We disagree.

13

As an initial matter, INPROTSA incorrectly assumes that the Convention Act provides an exhaustive list of actions and proceedings "falling under the Convention." 9 U.S.C. § 203. The Convention Act is merely a statute by which the Convention has been implemented in this country. *See* 9 U.S.C. § 201. The relevant inquiry under § 203 is not whether a particular action or proceeding is provided by the Convention Act; it is whether the "action or proceeding fall[s] under the Convention" itself. 9 U.S.C. § 203. And our observation in previous cases cited by INPROTSA—that the Convention Act appears to expressly recognize only two causes of action—does not resolve that inquiry. *See Escobar*, 805 F.3d at 1286[9]; *Lindo*, 652 F.3d at 1262–63; *Czarina*, 358 F.3d at 1290–91.

We note further that INPROTSA acknowledged before the district court that, "[a]lthough the Convention does not provide grounds for vacatur, *it explicitly permits such proceedings* in the countries in which an award was rendered or whose law served as governing law for the arbitration." USDC Doc. 15 at 8 (emphasis added) (citing the Convention art. V(1)(e)). Thus, INPROTSA must concede the Convention, at the very least, contemplates and expressly recognizes vacatur proceedings.

---

[9] *Escobar* implicitly undermines INPROTSA's interpretation of § 203 in this case. In *Escobar*, the defendant removed an action under § 205 *before* filing a motion to compel the case to arbitration. 805 F.3d at 1282–83. Under INPROTSA's reasoning, there would have been no jurisdiction, because the case removed from state court was neither an action to compel arbitration nor an action to confirm an arbitral award.

14

But even if we assume vacatur proceedings are not expressly provided by the Convention, INPROTSA's argument fails because it incorrectly assumes an action or proceeding cannot *fall under* a particular body of law unless the action or proceeding is *provided by* that body of law. In other words, even if the Convention does not expressly provide a cause of action for vacatur, an action seeking vacatur nevertheless could fall under the Convention. Indeed, many causes of action are provided by statutes entirely distinct from the body of law on which the action is based. For example, a cause of action to vindicate certain constitutional rights is provided by statute (*e.g.*, 42 U.S.C. §§ 1981, 1983). But it would be odd to suggest that an action or proceeding seeking to vindicate constitutional rights would not fall under the purview of the Constitution, merely because the Constitution itself did not expressly provide the cause of action.

In our view, an action or proceeding "fall[s] under the Convention," for purposes of § 203, when it involves subject matter that—at least in part—is subject to the Convention, such that the action or proceeding implicates interests the Convention seeks to protect. In practice, this will require that the case sufficiently relate to an agreement or award subject to the Convention, such that the agreement or award "could conceivably affect the outcome of the case." *Outokumpu Stainless USA, LLC v. Converteam SAS*, 902 F.3d 1316, 1324 (11th Cir. 2018).

15

Our interpretation of § 203 is reinforced by our understanding of § 205. Section 205 demonstrates congressional intent to provide a federal forum for resolving issues implicating the Convention.  We have explained that "[r]emoval jurisdiction can be considered a 'species' of subject matter jurisdiction in that it defines a federal court's power to hear a particular kind of case—one that was originally brought in a state court."  *Cogdell*, 366 F.3d at 1248.  We agree with INPROTSA that removal jurisdiction is not necessarily coincident with original subject-matter jurisdiction.  *See id.*; *see also Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232, 127 S. Ct. 2411, 2417 (2007) ("[W]hen a district court remands a properly removed case because it nonetheless lacks subject-matter jurisdiction, the remand is covered by [28 U.S.C.] § 1447(c) and thus shielded from review by § 1447(d).").  But the situations in which removal and subject-matter jurisdiction do not line up typically involve circumstances distinct from those presented in this case.

Indeed, district courts sometimes lack removal jurisdiction, despite having original subject-matter jurisdiction, because other requirements of the removal statute are not satisfied.  *See Cogdell*, 366 F.3d at 1248.  Likewise, subsequent events might divest a district court of its subject-matter jurisdiction, even though the case was properly removed under the applicable removal statute.  *See Powerex*, 551 U.S. at 232, 127 S. Ct. at 2417.  For example, a case may be removed on the

16

basis of diversity jurisdiction and then remanded later on the ground that diversity jurisdiction was subsequently destroyed by the addition of a non-diverse party. *See id.* at 231–32, 127 S. Ct. at 2417. But INPROTSA has provided no examples of a circumstance in which a court had removal jurisdiction over a case for which it lacked subject-matter jurisdiction *at the time of removal*.

In this case, Congress specifically authorized removal "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention." 9 U.S.C. § 205. It would make little sense for Congress to specifically authorize removal of cases over which the federal courts would lack subject-matter jurisdiction. It would likewise be puzzling for Congress to provide a federal forum for a party seeking to determine whether an international arbitral award should be enforced, while requiring the same litigants to remain in state court to determine whether the same award should be vacated under principles controlled largely by federal law.

It makes far more sense to conclude Congress intended § 203 to be read consistently with § 205 as conferring subject-matter jurisdiction over actions or proceedings sufficiently related to agreements or awards subject to the Convention. We therefore conclude the district court had subject-matter jurisdiction over INPROTSA's petition to vacate the Award.[10]

---

[10] We express no opinion on whether the Convention Act implicitly permits a petition to

17

B. *Dismissal of the Petition to Vacate*[11]

INPROTSA next challenges the district court's summary dismissal of its petition to vacate on the ground that it did not raise any of the defenses outlined by the Convention. INPROTSA contends the district court erred by applying our holding in *Industrial Risk*—that the defenses enumerated by the Convention provide the exclusive grounds for vacating an award subject to the Convention.[12] *See* 141 F.3d at 1446. According to INPROTSA, *Industrial Risk* was both wrongly decided and abrogated by the Supreme Court's subsequent decision in *BG Group*

---

vacate an international arbitral award filed directly in the district court. *See* 9 U.S.C. § 204 ("An action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States."). It is enough, in this case, to say that the district court had subject-matter jurisdiction over INPROTSA's petition once it was removed from state court under § 205.

[11] In reviewing denials of motions to vacate arbitration awards, we review "the district court's findings of fact for clear error and its legal conclusions *de novo*." *Bamberger Rosenheim, Ltd., (Israel) v. OA Dev., Inc., (U.S.)*, 862 F.3d 1284, 1286 (11th Cir. 2017).

[12] INPROTSA also argued, in a single footnote in its opening brief, that the district court erred by "retroactively" applying our precedent to a petition removed from state court. In support, it cited a Florida case stating that state courts are not bound to follow opinions of the lower federal courts. Br. of Appellant. at 39 n.8 (citing *Pignato v. Great W. Bank*, 664 So. 2d 1011, 1015 (Fla. 4th DCA 1995)). But INPROTSA provides no argument or authority for the counterintuitive proposition that, in a non-diversity case removed from state court, a district court is free (much less required) to disregard the precedent of the court of appeals for the circuit in which that district court is located, on an issue to which federal law applies. By failing to sufficiently develop its argument on that issue in its opening brief, INPROTSA has abandoned it. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

18

*PLC v. Republic of Argentina*, 572 U.S. 25, 44–45, 134 S. Ct. 1198, 1212–13 (2014).

As an initial matter, INPROTSA's contention that *Industrial Risk* was wrongly decided is irrelevant to our analysis of whether we are bound by its holding that the Convention provides the exclusive grounds for vacating an international arbitral award. *See United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) ("[A] panel cannot overrule a prior one's holding even though convinced it is wrong."). Under our rule concerning prior-panel precedent, "[w]e are bound by the holdings of earlier panels unless and until they are clearly overruled by this court *en banc* or by the Supreme Court." *Randall v. Scott*, 610 F.3d 701, 707 (11th Cir. 2010). The relevant inquiry, then, is whether *Industrial Risk* has been clearly overruled by the Supreme Court. It has not.

"To constitute an 'overruling' for the purposes of [the] prior panel precedent rule, the Supreme Court decision 'must be clearly on point.'" *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) (quoting *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003)). Moreover, "the intervening Supreme Court case [must] actually abrogate or *directly* conflict with, as opposed to merely weaken, the holding of the prior panel." *Id.* (emphasis added). Nothing in *BG Group* directly conflicts with *Industrial Risk*.

19

In *BG Group*, the Supreme Court granted certiorari to address the narrow issue of whether a particular kind of decision by an arbitrator is entitled to deference. *See* 572 U.S. at 29, 134 S. Ct. at 1203–04 ("The question before us is whether a court of the United States, in reviewing an arbitration award made under [an investment treaty between the United Kingdom and Argentina], should interpret and apply the local litigation requirement *de novo*, or with the deference that courts ordinarily owe arbitration decisions."). The Court was not asked to decide whether the Convention provides the exclusive grounds for vacating awards subject to the Convention, the parties did not brief that issue, and the Court did not address that issue in its opinion.

Rather, the Court was asked to vacate the award on the ground that the arbitrators "exceeded their powers" within the meaning of 9 U.S.C. § 10(a)(4) of the Federal Arbitration Act (FAA)—a ground not specifically provided by the Convention. 572 U.S. at 44, 134 S. Ct. at 1212. The Court reviewed the award and refused to vacate it, concluding the arbitrators had not "exceeded their powers." 572 U.S. at 44–45, 134 S. Ct. at 1212–13. The Court's reasoning in refusing to vacate the award—that an asserted ground for vacatur under the FAA did not apply on the merits—does not *directly* conflict with *Industrial Risk*'s holding that such a ground would not have warranted vacatur because the ground is not enumerated in the Convention.

20

At most, the Supreme Court's analysis *indirectly* suggests that the Convention does not supply the exclusive grounds for vacating an international arbitral award.  *See Bamberger Rosenheim, Ltd., (Israel) v. OA Dev., Inc., (U.S.)*, 862 F.3d 1284, 1287 n.2 (11th Cir. 2017) (noting the tension between *Industrial Risk* and *BG Group*).  But that is not enough under our precedent to conclude *Industrial Risk* has been overruled.  *See Kaley*, 579 F.3d at 1255.  The district court thus did not err by dismissing the petition to vacate, because INPROTSA did not assert a valid defense under the Convention.[13]

But even if we were not bound by *Industrial Risk*, the petition to vacate would warrant denial.   Of the original grounds cited in INPROTSA's petition, it asserts only three on appeal,[14] and none supports vacatur in this case.

INPROTSA first contends the tribunal exceeded its authority when it "rewrote the parties' agreement by reading out the 'as long as' language" which INPROTSA contends "condition[ed] INPROTSA's agreement not to sell to third-

---

[13] INPROTSA conceded as much at oral argument, acknowledging it would lose on the vacatur issue to the extent *Industrial Risk* was not overruled.  *See* Oral Argument at 10:25–10:44.

[14] INPROTSA's petition to vacate did not purport to rely on the FAA.  Nevertheless, in response to Del Monte's motion to dismiss the petition, INPROTSA urged the district court to consider its arguments that the tribunal exceeded its powers both under state law and the FAA, representing that the grounds on which they relied were the same under either body of law.  *See* USDC Doc. 15 at 9 (citing 9 U.S.C. § 10).  We therefore conclude INPROTSA did not waive its arguments under the FAA by failing to assert them first before the district court.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

21

parties [on] Del Monte's 'exclusive ownership' of the MD-2 variety."  Br. of

Appellant at 41.  INPROTSA's argument on this issue fails because the "as long

as" language to which it refers,[15] found in the Agreement's *Segunda* (Second)

clause, is ambiguous as to: (1) whether it modifies only INPROTSA's obligation to

avoid selling to third parties; or (2) whether it also modifies INPROTSA's

obligation to return or destroy the plants derived from Del Monte's MD-2 seeds

upon termination of the Agreement.  The obligation to return or destroy the plant

stock derived from Del Monte's seeds is found in a different part of the

Agreement's *Segunda* (Second) clause, and it is not immediately preceded by the

"as long as" qualifier.[16]  *See* USDC Doc. 1 at 42–43 (Spanish), 126 (tribunal's

interpretation), 139–40 (parties' competing translations).

---

[15] The tribunal based its decision on the original Agreement as written in Spanish.  But the parties submitted conflicting translations of the Agreement's *Segunda* (Second) clause in English—neither of which was adopted by the tribunal.  Under INPROTSA's version, the language on which it bases its argument states: "[A]*s long as* [Del Monte is] the exclusive owner[] of this variety, [INPROTSA] guarantees that it shall only sell the MD-2 fruit grown in its farm to [Del Monte] or to any of its affiliates, pursuant to the terms of this agreement." USDC Doc. 1 at 139 (emphasis added).

[16] According to INPROTSA's translation, the *Segunda* (Second) clause continues:

[Del Monte] shall supply the MD-2 variety seed to [INPROTSA] in Buenos Aires de Puntarenas and at no cost. . . . Thus, [INPROTSA] acknowledges that the seed to be received in its farm is exclusively owned by [Del Monte], and it shall not make any use of it or of any other vegetative material derived or obtained from the planting to be developed, unless it has the prior written consent of [Del Monte].  In this regard, the only purpose of this pineapple purchase and sale agreement is the production of the MD-2 variety, for its exclusive sale to [Del Monte], and therefore, if for any reason [INPROTSA] ceases to sell this pineapple to [Del Monte], or in the event that the agreement is terminated for any reason and at any time, either before or at completion of its term, [INPROTSA] shall

It would make sense for Del Monte to impose these obligations independently.  For example, it would be prudent to require INPROTSA to respect Del Monte's (purported) exclusive rights to the MD-2 variety, as against third parties, by requiring INPROTSA to refrain from selling MD-2 pineapples to such parties, "as long as" Del Monte maintained exclusive rights to the variety.  It would also make perfect sense for Del Monte to impose an independent obligation on INPROTSA to avoid selling MD-2 pineapples derived from the seeds it provided to INPROTSA at no cost—regardless of whether it held exclusive rights in the variety as against third parties.  Interpreting these obligations as independent would also be consistent with the tribunal's observation that INPROTSA's obligation to return or destroy the plant stock was acknowledged elsewhere in the contract without referring to Del Monte's exclusive ownership of the MD-2 variety.  *See* USDC Doc. 1 at 122.

It does not matter whether the tribunal's interpretation is correct; it is enough to note that the "as long as" language on which INPROTSA relies does not unambiguously condition INPROTSA's obligation to destroy or return the plant stock derived from Del Monte's seeds on Del Monte's maintaining exclusive

---

immediately cease production of this variety, pledging to destroy or return to [Del Monte] the vegetative material owned by it.

*Id.* at 139–40.

ownership of the variety as against third parties.  And the tribunal at least arguably interpreted the contract.  Thus, the tribunal did not exceed its authority.  *See Wiregrass Metal Trades Council AFL-CIO v. Shaw Envt'l & Infrastructure, Inc.*, 837 F.3d 1083, 1088 (11th Cir. 2016) (holding that an arbitrator does not exceed its authority by incorrectly interpreting an ambiguous contractual provision); *Computer Task Grp., Inc. v. Palm Beach Cty.*, 782 So. 2d 942, 943 (Fla. 4th DCA 2001) ("Under federal authority, which would apply to the contract in this case, the test for whether an arbitrator exceeds his authority is whether the arbitrator had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrator correctly decided that issue.").

INPROTSA next contends the tribunal "exceeded its authority by imposing its own rough sense of justice by awarding damages far in excess of the amount allowed by Florida law."  Br. of Appellant at 42.  But the authorities on which INPROTSA relied to establish its contention that Florida law would not permit the award are not clearly on point—that is, they do not deal with a disgorgement award based on revenues where the defendant's profits could not be calculated because the defendant refused to provide evidence of its expenses during discovery.  *See* USDC Doc. 1 at 33–34 (citing *HCA Health Serv's of Fla., Inc. v. Cyberknife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469, 470–71 (Fla. 4th DCA 2016) (dealing with the measure of a plaintiff's expectation damages rather than the measure of a

24

disgorgement award)).  INPROTSA cited no authority holding that a disgorgement award under such circumstances would require speculation about the amount of the defendant's expenses.

Moreover, under Florida law, an arbitrator's mistake as to the correct measure of damages would not warrant vacatur.  *See Commc'ns Workers of Am. v. Indian River Cty. Sch. Bd.*, 888 So. 2d 96, 99 (Fla. 4th DCA 2004) ("[T]he fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award." (quoting Fla. Stat. § 682.13)); *Computer Task Grp.*, 782 So. 2d at 943 ("[T]he arbitrator had the authority to award damages under the contract.  Even if he made an error of law in awarding some of the damages, a point we do not decide, we do not review his errors of law, if any.").

Lastly, INPROTSA contends the tribunal exceeded its authority by "refusing to apply the procedural rules the parties' [sic] had contracted for, i.e., ICC rules, permitting corrections of awards."  Br. of Appellant at 42.  But the tribunal, "comparatively more expert about the meaning of [its] own rule, [is] comparatively better able to interpret and to apply it."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85, 123 S. Ct. 588, 593 (2002).  The tribunal did not exceed its power by reasonably construing its own rules as barring substantive reconsideration of the merits of its damages award.

25

Accordingly, the district court would not have erred by denying INPROTSA's petition to vacate, even if our holding in *Industrial Risk* were not binding.

### C. *Confirmation of the Award*[17]

Finally, INPROTSA contends the Award should not have been confirmed, because the district court failed to consider the merits of INPROTSA's public-policy defenses.[18]  Contrary to INPROTSA's assertion on this issue, the district court did, in fact, rule on the merits of its defenses.  To the extent INPROTSA challenges the manner in which the district court addressed its fraud defense,[19] its argument lacks merit.

INPROTSA suggests that, because it asserted a public-policy defense based on fraud, the district court was required to disregard the arbitrator's findings and conduct its own inquiry into whether the agreement was fraudulently induced. From that premise, INPROTSA contends the district court should have concluded

---

[17] In reviewing a district court's confirmation of an arbitral award, we review its "findings of fact for clear error and its legal conclusions *de novo*."  *Bamberger Rosenheim,* 862 F.3d at 1286.

[18] Because we affirm the district court's conclusions on the merits of INPROTSA's confirmation defenses, we need not address INPROTSA's contention that the district court erred by concluding INPROTSA was barred from asserting defenses to confirmation because of its alleged failure to timely serve notice of the petition to vacate.

[19] INPROTSA failed to develop arguments with respect to any of its other purported defenses to confirmation.  Thus, any challenge to the district court's conclusions on those defenses is abandoned.  *See Sapuppo*, 739 F.3d at 681.

26

the Award was procured by fraud, based largely on a ruling Magistrate Judge Simonton made in the Dole Litigation.[20]  We disagree.

INPROTSA's argument hinges on dicta from a footnote in the Supreme Court's opinion in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n.14, 94 S. Ct. 2449, 2457 n.14 (1974).  In *Scherk*, the Supreme Court presumed without deciding that "the type of fraud alleged" in that case[21] "could be raised, under Art. V of the Convention . . . in challenging the enforcement of whatever arbitral award [was] produced through arbitration."  The Court further noted that "Article V(2)(b) of the Convention provides that a country may refuse recognition and enforcement of an award if 'recognition or enforcement of the award would be contrary to the public policy of that country.'"  *Id.* (quoting the Convention art. V(2)(b)).  Based on that language, INPROTSA contends it is entitled to re-litigate its fraud claim in federal court.

---

[20] Magistrate Judge Simonton's finding, in the context of a discovery dispute to which INPROTSA was not a party, that Del Monte attempted to mislead certain Costa Rican growers (none of whom are alleged to have been INPROTSA) by sending out letters implying that it held a patent on the MD-2, does not establish that the Agreement between INPROTSA and Del Monte was fraudulently induced.

[21] The issue in *Scherk* was whether to apply the now overruled holding of *Wilko v. Swan*, 346 U.S. 427, 438, 74 S. Ct. 182, 188 (1953), that an agreement to arbitrate could not preclude a lawsuit alleging a violation of the Securities Act of 1933, to a lawsuit brought against a foreign party that alleged violations of Rule 10(b) of the Securities Exchange Act of 1934.  *See Scherk*, 417 U.S. at 509–510, 94 S. Ct. at 2452–53.  Thus, the "type of fraud alleged," with which the Supreme Court was concerned in *Scherk*, was securities fraud.  *See id.* at 519 n.14, 94 S. Ct. at 2457 n.14.  We do not interpret *Scherk* as suggesting that an ordinary claim of fraudulent inducement, particularly one resolved through binding arbitration, would raise questions of public policy under the Convention.

27

Even if we, like the Supreme Court in *Scherk*, were to presume without deciding that a defendant can assert a fraud-based public-policy defense to confirmation under the Convention, it would not allow for re-litigation of a fraudulent-inducement claim already determined through binding arbitration.  If anything, public policy would require the federal courts to enforce the parties' agreement to arbitrate that claim.  *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S. Ct. 1801, 1806 (1967) (explaining that, where an agreement to arbitrate is broad enough to encompass fraudulent-inducement claims, an arbitrator must resolve any claim that the entire contract—rather than just its arbitration clause—was fraudulently induced); *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 995 (11th Cir. 2012) ("[S]ince the . . . allegations are more properly characterized as relating to fraud in the inducement, the issue becomes one properly reserved for an arbitrator.").

Moreover, we have held in the context of the FAA that vacatur cannot be premised on a purported fraud known at the time of the arbitration.  *See Scott v. Prudential Sec., Inc.*, 141 F.3d 1007, 1015 n.16 (11th Cir. 1998) ("[T]he arbitrators had all the material information before them, a fact that precludes vacatur. . . ."), *overruled in part on other grounds by Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 585, 128 S. Ct. 1396, 1403–04 (2008); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) (holding that vacatur for

fraud requires: (1) clear and convincing evidence; (2) that the fraud must not have been discoverable with due diligence prior to or during the arbitration; and (3) that the fraud materially relates to an issue in the arbitration); *see also A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1404 (9th Cir. 1992) ("[W]here the fraud or undue means is not only discoverable, but discovered and brought to the attention of the arbitrators, a disappointed party will not be given a second bite at the apple."). A fraud-based defense under the Convention could not possibly be broader than the fraud-based ground for vacatur expressly provided by the FAA. *See* 9 U.S.C. § 10(a)(1).

On the contrary, the public-policy defense under the Convention is very narrow. It "applies only when confirmation or enforcement of a foreign arbitration award would violate the forum state's most basic notions of morality and justice." *Bamberger Rosenheim*, 862 F.3d at 1289 n.4 (quoting *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1096–97 (9th Cir. 2011)). INPROTSA knew about the Dole Litigation at the time it contracted with Del Monte; therefore, enforcing the Award in this case does not offend public policy at all, much less meet the high threshold for such a defense to succeed under the Convention.

## IV.  CONCLUSION

29

The district court had jurisdiction over INPROTSA's petition to vacate the Award after it was removed from state court.  The petition was appropriately dismissed for failing to assert a valid ground for vacatur, and the district court did not err by confirming the Award.[22]

**AFFIRMED.**

---

[22] Del Monte's motion for sanctions (Doc. 73) is DENIED because INPROTSA's appeal raises a number of non-frivolous challenges to the district court's orders.

30