[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11080

_____

GULFSTREAM AEROSPACE CORPORATION,

Plaintiff-Appellee,

*versus*

OCELTIP AVIATION 1 PTY LTD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:16-cv-00127-WTM-CLR

_____

Before WILSON, ROSENBAUM, and ED CARNES, Circuit Judges.

PER CURIAM:

Long story, short:  if you want certain rules to apply to the handling of your arbitration, the contract must say so clearly and unmistakably.  Otherwise, the Federal Arbitration Act ("FAA") will apply.

The parties here did not do that.  So the FAA's arbitral-award standards for review govern.  And because Defendant-Appellant Oceltip Aviation 1 Pty Ltd. waived any argument under the FAA's arbitral-award standards that the arbitral award here should be vacated, the district court properly denied Oceltip's application to vacate the award and granted Plaintiff-Appellee Gulfstream Aerospace Corporation's application to confirm the award.  We therefore affirm the judgment of the district court.

## I.

Gulfstream is a Georgia corporation based in Savannah, and Oceltip is an Australian limited liability company.  They entered into a sales agreement ("Agreement").  Under that Agreement, Gulfstream was to manufacture and sell a new G550 business jet aircraft to Tinkler Gulfstream 650 Pty Ltd, Oceltip's former name.  The Agreement, as amended, required Oceltip to pay $27.15 million by January 15, 2013.

Though Oceltip paid Gulfstream about $7 million, it failed to make the full $27.15 million payment on time.  Nor did it pay the required amount within the ten-day cure period allowed under the Agreement.  So Gulfstream terminated the Agreement.

Not pleased with this result, Oceltip considered its options under the Agreement. Within that contract, under the subheading "Arbitration," two clauses relevant to this appeal appear. The first—Section 4.3.1—requires arbitration "by the American Arbitration Association ("AAA") in accordance with the provisions of its Commercial Arbitration Rules . . . ." and specifies that "judgment on the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof." The second—Section 4.3.3—directs that the contract "shall be governed by the laws of the State of Georgia, and the U.N. Convention on Contracts for the International Sale of Goods . . . shall not apply, without reference to rules regarding conflicts of law."

In accordance with Section 4.3.1, Oceltip submitted a demand for arbitration to the AAA. It sought a finding that Gulfstream had anticipatorily repudiated the Agreement, and that this conduct suspended Oceltip's duties, allowed Oceltip to recoup the $7 million it had paid, and entitled Oceltip to damages. Oceltip also sought a finding that the contract's liquidated-damages provision—Section 3.3.2—was a penalty and therefore unenforceable.

The liquidated-damages provision states that "[i]n the Event of Default by [Oceltip], Gulfstream shall be entitled to [as relevant here] . . . retain or collect, as liquidated damages and not as a penalty," $8 million. The amended Agreement reaffirms this understanding, specifying that "Gulfstream's damages in the Event of Default by Buyer will be difficult to ascertain, that the amounts

agreed to as liquidated damages are a reasonable pre-estimate of the probable loss, and that the Parties intend to provide for reasonable liquidated damages and not a penalty."

For its part, Gulfstream sought $8 million in liquidated damages under that provision, plus attorney's fees and costs, from the arbitration.

The arbitration hearing occurred in Savannah, Georgia. Following it, the three-member arbitration tribunal awarded Gulfstream liquidated damages totaling $8 million, plus attorney's fees, costs, and unreimbursed arbitration expenses. The panel denied relief to Oceltip.

Gulfstream applied in the United States District Court for the Southern District of Georgia to confirm the arbitration award. Meanwhile, in the Superior Court of Chatham County, Georgia, Oceltip sought to vacate the arbitration award.

Gulfstream removed Oceltip's state-court proceeding to the Southern District of Georgia. On Gulfstream's motion, the district court ordered the two cases consolidated.

Oceltip moved to remand, challenging the district court's subject-matter jurisdiction. It argued that, based on the choice-of-law clause in Section 4.3.3, the Agreement incorporated the Georgia Arbitration Code, and that provided for exclusive jurisdiction

in the Georgia state courts. In opposition, Gulfstream contended that the FAA authorized federal jurisdiction.

The parties also briefed their respective applications to confirm and vacate the arbitration award. In their briefing, the parties disputed whether federal law (the FAA) or state law (the Georgia Arbitration Code) supplied the standards governing whether the arbitrators' decision should be vacated or confirmed. And if the Georgia Arbitration Code governed the standards, the parties disagreed over whether the arbitrators had manifestly disregarded the law.

The district court denied Oceltip's motion to remand, granted Gulfstream's application to confirm the arbitration award, and denied Oceltip's application to vacate it. After holding that it had jurisdiction over the dispute, the court determined that the FAA's standards for vacatur applied to its decision. But even assuming the Georgia Arbitration Code's standards applied, the court concluded, Oceltip had not shown that the arbitrators manifestly disregarded the law.

Oceltip timely appealed.[1] On appeal, Oceltip again asserts that federal jurisdiction is lacking. It also argues that the district court erred in confirming the arbitration award and denying

---

[1] Although this case was originally scheduled for oral argument, Oceltip moved to submit it on the briefs, and Gulfstream did not oppose. We granted that motion.

vacatur because, in Oceltip's view, the Georgia Arbitration Code's standards for vacatur—not the FAA's—govern, and the arbitrators manifestly disregarded the law.

## II.

We begin with jurisdiction—because if we lack that, of course, we cannot consider the merits and must dismiss the appeal. We review our subject-matter jurisdiction de novo. *Inversiones y Procesadora Tropical INPROTSA, S.A. v. Del Monte Int'l GmbH*, 921 F.3d 1291, 1298 n.8 (11th Cir. 2019).

On appeal, Oceltip does not suggest that this matter does not satisfy the requirements for federal-court jurisdiction. Nor could it do so successfully. As we describe below, we have jurisdiction under Chapter 2 of the FAA.

To explain our jurisdiction, we start with a little background. In 1970, the United States acceded to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also called the "New York Convention." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998). The Convention's purpose "is to encourage the recognition and enforcement of international arbitral awards to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that is speedier and less costly than litigation." *Id.* (cleaned up).

The same year that the United States acceded to the Convention, Congress enacted Chapter 2 of the FAA, codified at 9 U.S.C. §§ 201–208.  That chapter incorporates the Convention into federal law, "mandat[ing] the enforcement of the New York Convention in United States courts." *Indus. Risk*, 141 F.3d at 1440. To facilitate that, Chapter 2 creates "original subject-matter jurisdiction over any action arising under the Convention." *Id.*  Indeed, 9 U.S.C. § 203 states that "[a]n action or proceeding falling under the convention shall be deemed to arise under the laws and treaties of the United States."  And it directs that "[t]he district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."  9 U.S.C. § 203.

We have construed Chapter 2 as extending to all arbitral awards not "entirely between citizens of the United States." *Indus. Risk*, 141 F.3d at 1440–41; *see also* 9 U.S.C. § 202 (stating that arbitral awards "arising out of [a commercial] relationship which is entirely between citizens of the United States" fall outside the Convention).  The arbitral award here—which concerns a contract for the sale of an aircraft—arises out of the commercial relationship between Gulfstream and Oceltip.  As we have mentioned, Oceltip is an Australian company, and Gulfstream is a United States corporation.  So their relationship is not "entirely between citizens of the United States," and the exception to Convention jurisdiction does not apply.

We have also held that §§ 203 and 205 confer subject-matter jurisdiction over arbitration vacatur actions removed from state court, *Inversiones*, 921 F.3d at 1299–1300, and § 203 endows federal courts with jurisdiction over actions to confirm an arbitral award, *see Escobar Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1286 (11th Cir. 2015); *see also* 9 U.S.C. § 207. So there's really no dispute that federal law provides for jurisdiction over this action.

Perhaps for that reason, Oceltip argues instead that the Agreement's choice-of-law provision eradicates our otherwise-existing jurisdiction. Oceltip relies on Sections 4.3.1 and 4.3.3 of the Agreement in support of this position. As a reminder, Section 4.3.1 states that "judgment on the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof." And Section 4.3.3 provides that "[t]his contract shall be governed by the laws of the State of Georgia, . . . without reference to rules regarding conflicts of law." Oceltip reads these two provisions together to deprive the federal courts of jurisdiction. In Oceltip's view, under the contract, the Georgia Arbitration Code governs jurisdiction, and under it, "only state superior courts have jurisdiction to confirm and vacate arbitration awards."

We disagree. Even assuming without deciding (at this point) that the Agreement's choice-of-law clause incorporates the Georgia Arbitration Code, state law cannot strip a federal court of federal jurisdiction. *Barrow S.S. Co. v. Kane*, 170 U.S. 100, 111 (1898) ("The jurisdiction so conferred upon the national courts

20-11080                Opinion of the Court                9

cannot be abridged or impaired by any statute of a state."). As Oceltip's mistaken argument is the only basis for its contention that we lack jurisdiction, and we have otherwise established our jurisdiction under § 203 of the FAA, we proceed to the merits.

## III.

Next, Oceltip argues that the district court wrongly refused to vacate and incorrectly confirmed the arbitral award. We review the court's underlying legal conclusions de novo and its findings of fact for clear error. *Bamberger Rosenheim, Ltd., (Israel) v. OA Dev., Inc., (United States)*, 862 F.3d 1284, 1286 (11th Cir. 2017).

More specifically, Oceltip contends that the Agreement's choice-of-law provision incorporated all Georgia law—including the Georgia Arbitration Code and its standards. In contrast, Gulfstream argues that while Georgia law governs resolution of the merits of the dispute, the federal standards (meaning the FAA's standards) control our review of the arbitral award.

Resolution of this disagreement determines whether arbitrators' "manifest disregard of the law" supplies a basis for vacating the award.[2]  Ga. Code Ann. § 9-9-13(b)(5).  Under the Georgia

---

[2] Because it makes no difference to the outcome here (and the parties did not brief the issue), we assume without deciding that parties can agree to standards for review of the arbitral award that differ from federal standards (meaning the standards that the FAA imposes). *But see Bowen v. Amoco Pipeline Co.*,

Arbitration Code, it does.  But federal law—the New York Convention and its implementing statute (Chapter 2 of the FAA)—sets forth seven exclusive grounds for vacatur. *Indus. Risk*, 141 F.3d at 1446; *see Inversiones*, 921 F.3d at 1302.  They do not include "manifest disregard of the law." *See M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 848 (6th Cir. 1996).

Before the district court, and now on appeal, Oceltip has not argued that any of the New York Convention's enumerated grounds for vacatur apply.  So if the Agreement's choice-of-law clause does not displace the federal standards, then without further analysis, we will confirm the award. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (holding that issues not raised in briefing on appeal are abandoned and therefore waived or forfeited).  Alternatively, if the Georgia Arbitration Code's standards do apply, then the parties dispute whether the arbitrators manifestly disregarded the law in analyzing the Agreement's liquidated damages clause.  As it turns out, we need not reach the alternative issue because we conclude that the Agreement's choice-of-law provision does not supplant federal standards for confirmation or vacatur of an arbitral award.

The Supreme Court has described Section 2 of the FAA, 9 U.S.C. § 2, as "a congressional declaration of a liberal federal policy

---

254 F.3d 925, 934–36 (10th Cir. 2001) (holding that parties cannot agree to expanded judicial review, beyond what the FAA permits, of an arbitral award).

20-11080                 Opinion of the Court                 11

favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). But the Supreme Court has recognized that this policy is grounded in a theory of consent. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989). So parties may "specify by contract the rules under which [an agreed] arbitration will be conducted." *Id.*

We look first to the plain meaning of the contractual language to ascertain the parties' intent about whether the FAA or the Georgia Arbitration Code standards of review govern. *See Internaves de Mex. s.a. de C.V. v. Andromeda Steamship Corp.*, 898 F.3d 1087, 1093 (11th Cir. 2018) (stating general common law of contracts). Here, despite Oceltip's insistence to the contrary, the plain language of the Agreement does not support Oceltip's position.

Oceltip points to the language that "[t]his contract shall be governed by the laws of the State of Georgia, . . . without reference to rules regarding conflicts of law." It notes that these words appear in the portion of the Agreement labeled "Arbitration" and urges that this text necessarily means that the parties agreed that the Georgia Arbitration Code governs the standards of review of the arbitral award (as opposed to Georgia law's application to only the merits of the arbitration).

We disagree. The context in which the quoted language appears is important. Restored to its relevant context, the quoted sentence says, "This contract shall be governed by the laws of the State of Georgia, and the U.N. Convention on Contracts for the International Sale of Goods ["CISG"] . . . shall not apply, without reference to rules regarding conflicts of law."

First, this passage indicates that "without reference to rules regarding conflicts of law" refers to any decision between the applicability of the CISG, on the one hand, and another body of law—such as Georgia law—on the other, that might have been required in the absence of the provision. In other words, the parties chose for Georgia law, not the CISG, to govern the contract, regardless of whether conflicts-of-law analysis would have favored application of the CISG.

Second, the provision's comparison of Georgia law to the CISG is instructive. The CISG does not establish standards for the review of arbitral awards; it is a set of "uniform rules which govern contracts for the international sale of goods," *see* CISG, at Preamble. So if the CISG had applied instead, it couldn't have supplied standards for review of the arbitral award. And the Agreement's contrast of the CISG with the laws of the State of Georgia indicates that the parties viewed Georgia law and the CISG to serve the same function in construing the Agreement. To put a finer point on it, because the CISG could not have provided standards for the review of the arbitral award, the clause suggests that the parties did not

intend for Georgia law to supply standards for review of the arbitral award.

Third, Section 4.3.1 of the Agreement requires arbitration "by the American Arbitration Association ("AAA") in accordance with the provisions of its Commercial Arbitration Rules." So the parties at least implicitly chose not to have the Georgia Arbitration Code cover the arbitration itself. Indeed, the Georgia Arbitration Code is not mentioned once in the Agreement. Given that the parties specified arbitration rules—and those rules weren't the Georgia Arbitration Code—it makes little sense that the parties would have intended and expected that the Georgia Arbitration Code nonetheless would govern review of any award resulting from arbitration.

So Oceltip next urges that *Volt*, 489 U.S. 468, as "affirm[ed]" by *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52 (1995), Appellant's Br. at 39, requires us to conclude that the Agreement demonstrates that the parties chose to be governed by the Georgia Arbitration Code in the conducting of the arbitration. We are not persuaded.

In *Volt*, Volt and Stanford University entered into a construction contract. 489 U.S. at 470. The contract specified that it would be governed by "the law of the place where the project is located," *id.* at 472, and it included an agreement to arbitrate all disputes between the parties "arising out of or relating to this contract or the breach thereof," *id.* at 470. When a dispute between

the parties arose, Volt made a formal demand for arbitration. *Id.* In response, Stanford filed suit against Volt in California state court, alleging breach of contract and fraud. *Id.* at 470–71. Stanford also sought indemnity from other companies involved in the construction project, with whom they had no arbitration agreements. *Id.* at 471. Faced with Stanford's suit, Volt sought for the California court to compel arbitration. *Id.* And Stanford responded by moving to stay arbitration under California law, which provided for a party to do so pending resolution of related litigation between a party to the arbitration agreement and third parties not bound by it, under circumstances applicable there. *Id.*

The California trial court denied Volt's motion to compel and stayed the arbitration proceedings until resolution of the litigation. *Id.* And the California appellate court affirmed. *Id.* It held that, by stating that the contract would be governed by "the law of the place where the project is located," the parties had incorporated the California rules of arbitration into their arbitration agreement. *Id.* at 472. The Supreme Court affirmed. *Id.* at 473.

Oceltip suggests that the Agreement's Georgia-law provision, similarly to how the contract clause in *Volt* permitted state arbitration procedural rules to be applied, requires application of state arbitration review standards instead of FAA review standards. Oceltip is mistaken.

First, as the Supreme Court explained six years later in *Mastrobuono*, *Volt*'s procedural posture was integral to the Court's

decision there. *Mastrobuono*, 514 U.S. at 60 n.4. In *Volt*, the Supreme Court received the case on review from the California Supreme Court, which had already construed its own state law. *See id.* So the Court deferred to the state court's construction of its own state law and did not interpret the contract there de novo. *Id.* But here, as in *Mastrobuono*, *see id.*, we review a federal court's interpretation of the governing contract. And as we have explained, our de novo review of the choice-of-law provision here does not support the notion that the parties agreed that the Georgia Arbitration Code would govern the standards of review of the arbitral award.

Second, we disagree with Oceltip that *Mastrobuono* somehow suggests that *Volt*'s rule applies here. Just the opposite.

In *Mastrobuono*, Shearson Lehman and the Mastrobuonos entered into a contract for the Mastrobuonos to trade securities. *See* 514 U.S. at 54. The contract included an arbitration clause and a choice-of-law provision, which stated that the contract "shall be governed by the laws of the State of New York." *Id.* at 58–59. The next sentence stated that "any controversy" arising out of the transactions between the parties "shall be settled by arbitration" in accordance with the rules of the National Association of Securities Dealers ("NASD"), or the Boards of Directors of the New York Stock Exchange, or the American Stock Exchange. *Id.* at 59.

When things went south and the parties arbitrated, the arbitration panel there awarded the Mastrobuonos, among other relief,

punitive damages. *Id.* at 54. But Shearson Lehman contended that the choice-of-law provision precluded the award of punitive damages under New York arbitration rules (because arbitration panels in New York could not award punitive damages), so it sought in federal district court to vacate that aspect of the award. *Id.* at 54–55. Based on their mistaken understanding of *Volt*, the district and circuit courts in *Mastrobuono* concluded that New York's arbitration rules governed the arbitration. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 812 F. Supp. 845, 848 (N.D. Ill. 1993); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 20 F.3d 713, 717 (7th Cir. 1994).

The Supreme Court reversed. 514 U.S. at 55. It first reviewed the choice-of-law provision. *See id.* at 59–60. After considering the plain meaning of that provision, the Supreme Court determined that the clause was "not, in itself, an unequivocal exclusion of punitive damages claims." *Id.* at 60. Then it turned to the arbitration provision. *See id.* The Court concluded that, rather than support Shearson Lehman's position that New York arbitration rules applied, the arbitration clause "strongly implie[d] that an arbitral award of punitive damages [wa]s appropriate [because] [i]t explicitly authorize[d] arbitration in accordance with NASD rules," and "NASD's Code of Arbitration Procedure indicate[d] that arbitrators may award 'damages and other relief.'" *Id.* at 60–61. Ultimately, the Court reasoned that, "[a]t most, the choice-of-law clause introduce[d] an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." *Id.* at 62.

20-11080                Opinion of the Court                17

But that was not enough for the Court to conclude that New York arbitration rules governed. *See id.*

The Court also concluded that "the best way to harmonize the choice-of-law provision with the arbitration provision [was] to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators."[3] *Id.* at 63–64.

*Mastrobuono* is not materially distinguishable from Oceltip's case. Indeed, the Agreement's clause stating that it "shall be governed by the laws of the State of Georgia" is distinguishable from the provision in *Mastrobuono* that said that the contract there "shall be governed by the State of New York" only in that the clause in the Agreement further specifies that the CISG shall not control the Agreement. But as we have explained, that distinction makes the case stronger for application of federal standards of arbitral-award review. And as with the arbitration provision in *Mastrobuono*, the arbitration clause here can be harmonized with the choice-of-law provision to give effect to both: "the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other." *Id.* at 64. In sum, then, the Agreement does not evidence a clear intent by the parties that the Georgia Arbitration

---

[3] In addition, the Court explained that Shearson Lehman had drafted the contract, so ambiguities were to be construed against it. *Mastrobuono*, 514 U.S. at 62. But that served as a separate rationale for the Court's decision.

Code—as opposed to federal arbitral-award vacatur standards—control.

One final note: our decision today puts us in good company. All eight other Circuits that have opined on the proper reading of *Volt* and *Mastrobuono* have concluded, as we do, that *Volt* has no application when, as here, a federal court reviews contractual language de novo. *See, e.g.*, *PaineWebber, Inc. v. Elahi*, 87 F.3d 589, 594 n.5 (1st Cir. 1996); *Nat'l Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 134 (2d Cir. 1996); *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 295 (3d Cir. 2001), *abrogated on other grounds by Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008); *Porter Hayden Co. v. Century Indem. Co.*, 136 F.3d 380, 383 n.6 (4th Cir. 1998); *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 342 n.15 (5th Cir. 2004); *Ferro Corp. v. Garrison Indus., Inc.*, 142 F.3d 926, 936 (6th Cir.1998); *UHC Mgmt. Co., Inc. v. Comput. Scis. Corp.*, 148 F.3d 992, 996 (8th Cir. 1998); *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1212–13 (9th Cir. 1998). In short, the district court correctly determined that the FAA's review standards govern here.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED**.