[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11815

_____

D.C. Docket No. 1:16-cv-21559-FAM

SLADJANA CVORO, Serbia,

Plaintiff-Appellant,

versus

CARNIVAL CORPORATION,
d.b.a. Carnival Cruise Lines,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 17, 2019)

Before ROSENBAUM, GRANT and HULL, Circuit Judges.

HULL, Circuit Judge:

Plaintiff Sladjana Cvoro appeals the district court's denial of her petition to "vacate and/or alternatively to deny recognition and enforcement" of the foreign arbitral award in favor of her employer, defendant Carnival Corporation d.b.a. Carnival Cruise Lines ("Carnival"), on Cvoro's claims brought under the Jones Act, 46 U.S.C. § 30104, and U.S. maritime law for injuries related to the carpal tunnel syndrome she developed while working on a Carnival cruise ship.  The district court denied Cvoro's petition because, even though the arbitrator did not apply U.S. law during arbitration, enforcing the foreign arbitral award did not violate U.S. public policy.  After careful review of the unique factual circumstances of this case and with the benefit of oral argument, we must affirm.

## I.  FACTUAL BACKGROUND

### A.     Seafarer's Employment Agreement

In August 2012, Cvoro, who is a citizen and resident of Serbia, signed a seafarer's employment agreement (the "seafarer's agreement") to work for Carnival.  Carnival is a Panamanian corporation that operates cruise ships with its principal place of business in Miami, Florida.  Everett v. Carnival Cruise Lines, 912 F.2d 1355, 1357 (11th Cir. 1990).

In her seafarer's agreement, as a condition of her employment, Cvoro agreed to resolve all legal disputes with Carnival by arbitration.  Specifically, Cvoro's seafarer's agreement contains mandatory-arbitration and forum-selection clauses,

2

which provide that "[t]he place of arbitration shall be London, England, Monaco, Panama City, Panama or Manila, Philippines whichever is closer to the Seafarer's home country."  Her seafarer's agreement also contains a choice-of-law clause designating the governing law for disputes as the laws of the flag of the cruise ship on which Cvoro was assigned:

> Governing Law. This Agreement shall be governed by, and all disputes arising under or in connection with this Agreement of Seafarer's service on the vessel shall be resolved in accordance with, the laws of the flag of the vessel on which Seafarer is assigned at the time the cause of action accrues, without regard to principles of conflicts of laws thereunder.  The parties agree to this governing law notwithstanding any claims for negligence, unseaworthiness, maintenance, cure, failure to provide prompt, proper and adequate medical care, wages, personal injury, or property damage which might be available under the laws of any other jurisdiction.

Cvoro does not dispute that she entered into this seafarer's agreement or what its terms say.

## B.    Cvoro's Employment on the Carnival Dream

Beginning in August 2012, Carnival employed Cvoro as a seaman to work as an assistant waitress aboard the cruise ship Carnival Dream, which sails under the flag of Panama.  During her employment, Cvoro developed pain and swelling in her left wrist.  On March 28, 2013, Cvoro reported to the shipboard medical center, complaining of pain and swelling in her left wrist, and "pins and needles" in her wrist and hand.  The ship's physician gave Cvoro a splint and prescribed her prednisone to stop the swelling.

3

The next day, Cvoro returned to the medical center with the same left wrist pain, which was getting worse. This time, the physician prescribed her ketorolac and naproxen to treat the pain. Despite this treatment, Cvoro's condition did not improve. On March 31, 2013, Cvoro went to the medical center a third time for her wrist pain, at which point the ship's physician determined that she could no longer carry out her duties aboard the ship. Cvoro was taken off duty the next day.

On April 1, 2013, Cvoro was examined by an orthopedic specialist ashore in Cozumel, Mexico, who diagnosed her as having carpal tunnel syndrome. Thereafter, Cvoro stopped working on the Carnival Dream, and upon her own request, defendant Carnival repatriated her home to Serbia.

To comply with its maintenance and cure obligations under maritime law, Carnival selected shore-side physicians in Serbia to continue treating Cvoro's condition. On May 28, 2013, a doctor selected by Carnival performed surgery on Cvoro for her carpal tunnel syndrome. According to Cvoro, shortly after her surgery, she began experiencing horrific symptoms due to the negligence of the Serbian doctors, and she was eventually diagnosed with complex regional pain syndrome. After further treatment from a variety of specialists in Europe, on June 30, 2014, Cvoro's physicians declared her to have reached maximum medical improvement. But to date, Cvoro suffers from gross motor deficits in her left hand

4

and wrist, frozen shoulder, tendonitis of the wrist, and other permanent problems with her left arm.

## C.    Arbitration in Monaco

Pursuant to her seafarer's agreement, Cvoro filed an arbitration proceeding against Carnival in Monaco—the venue closest to her home country Serbia—in an attempt to recover for her injuries.  She asserted two claims based on U.S. law.  First, Cvoro brought a claim under the Jones Act, 46 U.S.C. § 30104, asserting that Carnival was vicariously liable for the alleged negligence of the shore-side doctors it selected to treat her carpal tunnel syndrome.  Second, Cvoro asserted a claim under general maritime law, that is, the doctrine of maintenance and cure, for Carnival's alleged failure to provide her with medical treatment and to pay for her medical bills and room and board.  This second claim was later dropped because Carnival had in fact paid for all of Cvoro's medical bills and expenses for room and board.

## D.    Panamanian Law Governed Arbitration

As a preliminary matter, the arbitrator determined that Panamanian law governed the arbitration proceeding because, in the choice-of-law clause of the seafarer's agreement, the parties agreed that the law of Panama would apply.  Panama is where the Carnival Dream is flagged.  The arbitrator concluded further that Cvoro did not establish that U.S. law should apply, notwithstanding the

5

choice-of-law clause, because there was not a sufficiently close connection between the dispute and the United States. In reaching this conclusion, the arbitrator noted that: (1) Cvoro was in Serbia; (2) Carnival is incorporated in Panama; (3) the Carnival Dream was flagged in Panama at all relevant times; (4) the parties chose Panamanian law to govern the dispute; (5) the seat of the arbitration was Monaco; (6) there was no evidence that the Carnival Dream was in U.S. territorial waters when the alleged cause of action accrued; and (7) Cvoro did not allege that the United States was the only venue for enforcing an arbitral award against Carnival in the event that she prevailed. In fact, the only connection between the dispute and the United States was that Carnival's principal place of business is in Miami, which the arbitrator deemed insufficient to disregard the parties' valid agreement to apply Panamanian law.

Despite this ruling, Cvoro persisted in arguing that her claim was based solely on U.S. law—that is, a Jones Act claim that Carnival was vicariously liable for the negligence of the shore-side physicians in Serbia that it selected to treat her carpal tunnel syndrome. Cvoro even invited the arbitrator to find in favor of Carnival because, she contended, she had no cause of action under Panamanian law. On that score, it is undisputed that Panamanian law does not recognize a claim based on vicarious liability for shore-side malpractice occurring after a seaman leaves the vessel.

6

As the parties' experts at arbitration generally agreed, Panamanian law recognizes that Cvoro, as a seafarer who was injured aboard a vessel, has a labor (contractual) cause of action and a tort cause of action for negligence against Carnival. The labor claim under Panamanian law is akin to a no-fault maintenance and cure claim under U.S. law. Panamanian law also recognizes a claim related to disability compensation for any occupational injury or illness irrespective of fault, but Cvoro did not pursue this remedy. In addition, Panamanian law recognizes a seafarer's action for the negligence of her employer or the shipowner, such as a claim for Carnival's negligent hiring of the shore-side physicians. But Cvoro did not pursue a direct negligence claim against Carnival either.

## E.    Arbitrator's Final Award

Even though Cvoro conceded that she had not pursued any cause of action under Panamanian law, in its final award, the arbitrator examined Cvoro's possible claims under Panamanian law, based on both labor and tort law. First, as to a claim for maintenance and cure, the arbitrator found that such a claim failed because Cvoro did not contest that Carnival satisfied its obligations to provide assistance, room and board, and medical care. As to a disability claim, the arbitrator determined that, because Cvoro's claim was based solely on the medical negligence of the shore-side physicians in Serbia, which occurred after she signed off the Carnival Dream, Carnival had no obligation to pay any disability.

7

Moreover, the arbitrator concluded that Cvoro's tort-based claim failed because she did not establish that Carnival was directly negligent in any way. Accordingly, the arbitrator dismissed Cvoro's claims.

## II. PROCEDURAL HISTORY

### A. District Court Proceedings

In May 2016, Cvoro filed the instant suit in the district court in the United States District Court for the Southern District of Florida, seeking to (1) "vacate and/or alternatively to deny recognition and enforcement" of the arbitral award under Article V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or the "Convention")[1] (Count I) and (2) then litigate the merits of her Jones Act claim based on Carnival's alleged vicarious liability for the malpractice of the shore-side doctors it selected to treat her (Count II) and an overlapping claim under general maritime law for damages caused by the doctors' malpractice (Count III).[2] After preliminary motions, the district court bifurcated the proceeding to adjudicate first the threshold and

---

[1]The Convention on the Recognition and Enforcement of Foreign Arbitral Awards is commonly known as the New York Convention. See New York Convention, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38.

[2]Because Cvoro's request to deny recognition and enforcement of the foreign arbitral award under the New York Convention was only ancillary to her Jones Act and general maritime law claims, we need not contemplate, and do not decide, whether the district court would have had subject matter jurisdiction had Cvoro solely moved to vacate the foreign arbitral award.

potentially dispositive issue of Cvoro's request that the district court refuse to enforce the arbitral award.

In further briefing on the issue, Cvoro argued that the arbitral award was void as being against U.S. public policy because the arbitrator applied Panamanian law, not U.S. law, which deprived her of the opportunity to assert a Jones Act claim against Carnival for vicarious liability. The arbitrator's final award, therefore, refused to give her the Jones Act remedy available in the United States, to which she was entitled as a seafarer. On this basis, Cvoro argued that enforcing the final arbitral award violated U.S. public policy and thus must be vacated under Article V(2)(b) of the New York Convention.

In response, Carnival contended, inter alia, that the district court should deny the petition to vacate the arbitral award because: (1) Cvoro had a meaningful remedy in arbitration under Panamanian law; and (2) Cvoro's arguments did not overcome the clear federal interest in enforcing arbitration awards under the New York Convention.

In April 2018, the district court issued its order denying Cvoro's request that it refuse to enforce the arbitral award and dismissing her claims brought under the Jones Act and general maritime law. In assessing whether the arbitrator's dismissal of Cvoro's Jones Act claim violated U.S. public policy, the district court identified three American public policies that were at play. First, the United States

has a strong federal policy favoring arbitration, which applies with special force in the field of international commerce.  Second, the United States has an explicit, well-defined, and dominant public policy extending "special solicitude" to seamen, who are considered "wards of admiralty."  And third, the Supreme Court has rejected the notion that all disputes must be resolved under U.S. law, even where foreign law provides a lesser remedy.

The district court then concluded that the distinctions between Panamanian law and U.S. law did not overcome the strong federal presumption to enforce arbitral awards, especially because Cvoro's theory of vicarious liability is not an explicitly "well-defined and dominant" U.S. policy "rooted in basic notions of morality and justice."  Of significance, the district court highlighted that Cvoro never attempted to pursue any remedies under Panamanian law, so the court could not say that the remedies during arbitration were so inadequate as to render the proceeding and its result unfair.  The district court therefore determined that Cvoro did not establish that enforcing the arbitral award would violate U.S. public policy.

This appeal followed.

**B.    Monaco Court Confirms Arbitral Award**

Meanwhile, after Cvoro initiated this lawsuit in the district court, and while it was still pending there, defendant Carnival instituted a parallel proceeding in the seat of the arbitration, Monaco, seeking confirmation of the arbitral award.  On

March 21, 2019, the court of first instance in Monaco issued final judgment in favor of Carnival confirming the arbitral award because: (1) the seafarer's agreement was valid and enforceable under Monegasque law and the New York Convention; and (2) Cvoro did not provide evidence that the arbitral award was invalid as contrary to Panamanian law or Monaco's international public policy.

## III.  STANDARD OF REVIEW

In reviewing a district court's decision regarding the enforcement of a foreign arbitral award, we review its "findings of fact for clear error and its legal conclusions de novo."  Inversiones y Procesadora Tropical INPROTSA, S.A. v. Del Monte Int'l GmbH, 921 F.3d 1291, 1304 n.17 (11th Cir. 2019) (quotation omitted); see also Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434, 1443 (11th Cir. 1998) (requiring de novo review of whether admission of expert testimony at arbitration violated U.S. public policy).

## IV.  NEW YORK CONVENTION

### A.    New York Convention, Generally

We begin with the New York Convention, which Cvoro relies upon in arguing that the district court erred in denying her petition to vacate the arbitral award.  In 1958, the United Nations Economic and Social Council adopted the New York Convention.  Lindo v. NCL (Bahamas), Ltd., 652 F.3d 1257, 1262 (11th Cir. 2011).  In 1970, the United States acceded to the Convention, which was

11

implemented that same year by Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 et seq. See 9 U.S.C. § 201 ("The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter."); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631, 105 S. Ct. 3346, 3356 (1985).

The Convention requires that contracting states, such as the United States, recognize written arbitration agreements concerning subject matter capable of settlement by arbitration:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

New York Convention, art. II(1).

The U.S. Supreme Court has explained that "the principal purpose" behind the adoption of the Convention "was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." Scherk v. Alberto–Culver Co., 417 U.S. 506, 520 n.15, 94 S. Ct. 2449, 2457 n.15 (1974). By encouraging the recognition and enforcement of international arbitration agreements and awards, the Convention "relieve[s] congestion in the courts and . . . provide[s] parties with an alternative

method for dispute resolution that [is] speedier and less costly than litigation."
Indus. Risk Insurers, 141 F.3d at 1440 (quotation omitted) (final alteration in original).  In that vein, the Supreme Court has emphasized that the United States has a "federal policy in favor of arbitral dispute resolution" which "appl[ies] with special force in the field of international commerce."  Mitsubishi Motors, 473 U.S. at 631, 105 S. Ct. at 3356.

To that end and as relevant here, the FAA creates two causes of action in federal court regarding an international arbitration agreement that falls under the New York Convention.  First, a party may file a motion to compel that arbitration be held in accordance with an arbitration agreement.  9 U.S.C. § 206; Suazo v. NCL (Bahamas), Ltd., 822 F.3d 543, 546 (11th Cir. 2016).  Second, after arbitration is completed, a party may file a motion to confirm the arbitral award, at which time the opposing party may raise a particular set of defenses as to whether the district court should enforce the arbitral award.  9 U.S.C. § 207; Lindo, 652 F.3d at 1280 (explaining that defenses to the enforcement of an arbitral award may be raised at the arbitration-award-enforcement stage in actions brought under 9 U.S.C. § 207).  This case concerns only the latter cause of action.

At this arbitration-award-enforcement stage, a district court must confirm the arbitral award unless a party "successfully assert[s] one of the seven defenses against enforcement of the award enumerated in Article V of the New York

13

Convention." Indus. Risk Insurers, 141 F.3d at 1441; see also 9 U.S.C. § 207;

New York Convention, art. III. Here, Cvoro invoked only one of the seven

defenses listed in Article V—that enforcement of the arbitral award would be

contrary to the public policy of the United States. The party opposing enforcement

of the award, here Cvoro, has the burden of proving that Article V defense

discussed below. Indus. Risk Insurers, 141 F.3d at 1442; Imperial Ethiopian Gov't

v. Baruch-Foster Corp., 535 F.2d 334, 335–36 (5th Cir. 1976).

**B.     Article V(2)(b): Public-Policy Defense**

The New York Convention's public-policy defense, Article V(2)(b), states

that enforcement of an arbitral award "may . . . be refused if the competent

authority in the country where . . . enforcement is sought finds that . . . recognition

or enforcement of the award would be contrary to the public policy of that

country." New York Convention, art. V(2)(b); see also Vimar Seguros y

Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540, 115 S. Ct. 2322, 2330

(1995) ("'A court in the United States need not recognize a judgment of the court

of a foreign state if . . . the judgment itself, is repugnant to the public policy of the

United States.'" (alteration in original) (quoting 1 Restatement (Third) of Foreign

Relations Law of the United States § 482(2)(d) (1986))).

"[T]he public-policy defense under the Convention is very narrow" and is

likewise to be construed narrowly in light of the presumption favoring enforcement

14

of international arbitral awards.  Inversiones y Procesadora, 921 F.3d at 1306;

Indus. Risk Insurers, 141 F.3d at 1445.  The defense applies to only violations of

an "explicit public policy" that is "well-defined and dominant" and is ascertained

"by reference to the laws and legal precedents and not from general considerations

of supposed public interests."  Indus. Risk Insurers, 141 F.3d at 1445 (internal

quotation marks omitted) (citing Drummond Coal Co. v. United Mine Workers,

Dist. 20, 748 F.2d 1495, 1499 (11th Cir. 1984)).

Moreover, the public-policy defense "applies only when confirmation or

enforcement of a foreign arbitration award would violate the forum state's most

basic notions of morality and justice."  Inversiones y Procesadora, 921 F.3d at

1306 (internal quotation marks omitted) (quoting Bamberger Rosenheim, Ltd.,

(Israel) v. OA Dev., Inc., (United States), 862 F.3d 1284, 1289 n.4 (11th Cir.

2017).  Consequently, "[a]lthough this defense is frequently raised, it 'has rarely

been successful.'"  Ministry of Def. & Support for the Armed Forces of the Islamic

Republic of Iran v. Cubic Def. Sys., Inc., 665 F.3d 1091, 1097 (9th Cir. 2011)

(quoting Andrew M. Campbell, Annotation, Refusal to Enforce Foreign

Arbitration Awards on Public Policy Grounds, 144 A.L.R. Fed. 481 (1998 &

supp.)); see, e.g., Indus. Risk Insurers, 141 F.3d at 1444–45 (rejecting a party's

public-policy defense against enforcement of an arbitral award because the

violation alleged—the side-switching of an expert witness during arbitration—was

15

not so "well-defined and dominant" to rise to the level of a "public policy of the sort required to sustain a defense under article V(b)(2) of the New York Convention").

## V.  DISCUSSION

On appeal, Cvoro argues that the arbitral award should not be enforced because enforcement is contrary to the United States' explicit public policy with respect to the protection of seamen, who have long been treated as wards of admiralty.  According to Cvoro, this public policy was articulated by Congress in the expansive protections afforded to seamen as part of the Jones Act, which includes providing seamen with a cause of action against their employer based on the vicarious liability for injuries sustained due to the negligence of their employer's agents.  See 46 U.S.C. § 30104 (incorporating the provisions of the Federal Employers' Liability Act applicable to railway workers, including 45 U.S.C. § 51, which holds an employer vicariously liable for the negligence of its agents); Hopson v. Texaco, Inc., 383 U.S. 262, 264, 86 S. Ct. 765, 766 (1966). Relying on a footnote in Mitsubishi Motors, Cvoro maintains that because she was deprived of this Jones Act remedy during arbitration, the arbitral award violates U.S. public policy, rendering it unenforceable in the United States under Article V(2)(b) of the Convention.  See Mitsubishi Motors, 473 U.S. at 637 n.19, 105 S. Ct. at 3359 n.19.

16

## A.    Relevant Caselaw

Our Court has never addressed at this arbitration-award-enforcement stage whether depriving a seaman of a Jones Act remedy violates U.S. public policy for purposes of the Article V(2)(b) defense.  However, two of our decisions provide substantial guidance.

First, in Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (11th Cir. 1998), we addressed the "question of whether the anti-waiver provisions of the United States securities laws preclude enforcement of certain choice-of-law and forum-selection clauses . . . in international agreements."  Id. at 1287.  Acknowledging that choice clauses "may operate in tandem as a prospective waiver of the statutory remedies for securities violations," this Court nevertheless held that the choice clauses were enforceable and not contrary to public policy.  Id. at 1287, 1298 (internal quotation omitted).  In so ruling, we examined whether the English remedies were inadequate, given that English law contained no direct analogues to the U.S. Securities Act for securities registration violations.  Id. at 1297.  We recognized numerous ways in which English securities law allegedly provided inferior remedies as compared to U.S. law.  Id. at 1297–98.  Despite the fact that "the United States securities laws would provide [appellants] with a greater variety of defendants and a greater chance of success due to lighter scienter

17

and causation requirements," we refused to invalidate the choice clauses "simply because the remedies available in the contractually chosen forum are less favorable than those available in the courts of the United States." Id. at 1297 (quotation omitted) (alteration in original). "Instead, we will declare unenforceable choice clauses only when the remedies available in the chosen forum are so inadequate that enforcement would be fundamentally unfair." Id.

More recently, in Lindo, our Court confronted a similar issue as here regarding waiver of a seaman's Jones Act remedy in arbitration, albeit at the earlier arbitration-enforcement stage. In Lindo, the seafarer, Harold Lindo, brought a Jones Act claim against his employer, the cruise line operator NCL (Bahamas) Ltd. ("NCL"), in Florida state court, alleging that he had injured his back while lifting trash bags at work. 652 F.3d at 1260–61. The employment agreement between NCL and Lindo required that such claims be arbitrated in Nicaragua (the country where Lindo was a citizen) and that the law of the Bahamas (the law of the vessel) would apply. Id. at 1261. NCL removed the case to federal court and then moved to compel arbitration, which the district court granted. Id. at 1261–62. Lindo appealed, arguing, inter alia, that the application of Bahamian law in the arbitral forum would eliminate his U.S. statutory claim under the Jones Act. Id. at 1263–64. Therefore, according to Lindo, compelling arbitration would violate public policy under the New York Convention. Id.

18

This Court affirmed the district court's order compelling arbitration. First, we extensively examined a series of cases where the Supreme Court and this Court enforced forum-selection and choice-of-law clauses in contracts that required application of non-American law in suit or arbitration. Lindo, 652 F.3d at 1264–69. For starters, in M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S. Ct. 1907 (1972), the Supreme Court "announced a strong presumption in favor of enforcing such forum-selection clauses, despite the possibility that a markedly different result would be obtained if the case proceeded in English courts as opposed to American Courts." Lindo, 652 F.3d at 1264. Two years later, in Scherk v. Alberto–Culver Co., 417 U.S. 506, 94 S. Ct. 2449 (1974), the Supreme Court "recognized that U.S. statutory claims are amenable to arbitral resolution— even U.S. statutory claims containing anti-waiver provisions." Lindo, 652 F.3d at 1264–65. After reviewing these cases and others, we distilled from the Supreme Court precedents several overarching themes applicable to agreements requiring the application of non-American law in international arbitrations:

> (1) courts should apply a strong presumption in favor of enforcement of arbitration and choice clauses; (2) U.S. statutory claims are arbitrable, unless Congress has specifically legislated otherwise; (3) choice-of-law clauses may be enforced even if the substantive law applied in arbitration potentially provides reduced remedies (or fewer defenses) than those available under U.S. law; and (4) even if a contract expressly says that foreign law governs . . . courts should not invalidate an arbitration agreement at the arbitration-enforcement stage on the basis of speculation about what the arbitrator will do, as there will be a later opportunity to review any arbitral award.

19

Id. at 1265-69 (emphasis added).  The Lindo Court then concluded that Lindo could not raise the public-policy defense under Article V(2)(b) at that time, because that defense "applies only at the arbitral award-enforcement stage and not at the arbitration-enforcement stage."  Id. at 1280.

Nevertheless, we assumed arguendo that Lindo could raise the Article V(2)(b) public-policy defense at the arbitration-enforcement stage, and this Court said that his challenge to the arbitration agreement—that it was void as against public policy because he would be prevented from asserting his Jones Act claim under Bahamian law—would still fail.  Id. at 1283–84.  This is because "(1) Bahamian law itself recognizes negligence actions; and (2) even if, as Lindo claims, U.S. law under the Jones Act has a more relaxed causation standard for negligence claims than Bahamian law, these were precisely the same arguments lodged (and rejected) in Lipcon."  Id. at 1283.  Moreover, Lindo did not show that international arbitration under Bahamian negligence law would provide an inadequate remedy such that enforcement of the choice-of-law provision would be "fundamentally unfair."  Id. at 1283–84.  Finally, this Court observed that Lindo's position would effectively eviscerate the mutually binding nature of the New York Convention because every country could refuse to recognize valid, mutually agreed-upon arbitration provisions if they contemplate the application of foreign law.  Id. at 1284–85.

20

B.    **Competing Public Policies at Issue**

Against this legal framework, we will now consider the competing public policies at issue in this case.  First, we agree with Cvoro that the United States has an "explicit public policy that is well-defined and dominant" with respect to the solicitude of seamen.  Indus. Risk Insurers, 141 F.3d at 1445 (quotations omitted).  American courts have long acted to protect the interests of seafarers, including "from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed."  Collie v. Fergusson, 281 U.S. 52, 55, 50 S. Ct. 189, 191 (1930); see also Aguilar v. Standard Oil Co. of N.J., 318 U.S. 724, 727–28, 63 S. Ct. 930, 932–33 (1943) ("[W]ith the combined object of encouraging marine commerce and assuring the well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon the owners of ships.  In this country these notions were reflected early, and have since been expanded, in legislation designed to secure the comfort and health of seamen aboard ship[.]").  For instance, when a seaman falls ill or suffers an injury in the service of the ship, maritime law requires her employer or the shipowner to provide "maintenance and cure of the seaman for illness or injury during the period of the voyage, and in some cases for a period thereafter."  Cent. Gulf Steamship Corp. v. Sambula, 405 F.2d 291, 300 (5th Cir. 1968).

Second, when assessing whether enforcing an arbitral award violates public policy, we also must consider that the United States has a "federal policy in favor of arbitral dispute resolution" which "applies with special force in the field of international commerce." Mitsubishi Motors, 473 U.S. at 631, 105 S. Ct. at 3356. Third, we also recognize that "[t]he Supreme Court has rejected the 'concept that all disputes must be resolved under our laws and in our courts,' even when remedies under foreign law do not comport with American standards of justice." Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft MBH & CIE KG, 783 F.3d 1010, 1017 (5th Cir. 2015) (quoting M/S Bremen, 407 U.S. at 9, 92 S. Ct. at 1912– 13 (1972)). The Supreme Court has admonished: "To determine that 'American standards of fairness' . . . must [apply] . . . demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries." Scherk, 417 U.S. at 517 n.11, 94 S. Ct. at 2456 n.11. Indeed, as we intimated in Lindo, United States public policy does not necessarily disfavor applying foreign law during arbitration, even when the foreign law provides a seaman with reduced or different remedies than those available under U.S. law. Lindo, 652 F.3d at 1264–69, 1283–85.

And fourth, we may consider the fact that the Monaco court already has confirmed the arbitral award in this case, which weighs in favor of enforcement here. That is because we take into account "concerns of international comity,

22

respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes[,] . . . even assuming that a contrary result would be forthcoming in a domestic context." Mitsubishi Motors, 473 U.S. at 629, 105 S. Ct. at 3355.

## C.    Analysis of Public-Policy Defense

Weighing the policies at issue and considering the specific unique factual circumstances of this case, we must conclude that Cvoro's Article V(2)(b) defense fails. Cvoro's public-policy defense hinges on the adequacy of remedies under Panamanian law afforded to her as a seaman. We acknowledge that the arbitrator in Monaco dismissed Cvoro's Jones Act claim, awarding her nothing. We also acknowledge that, if Cvoro were to prevail in a suit under United States law based on Carnival's vicarious liability for the negligence of the shore-side physicians who treated her, she may well recover money damages. But that likelihood, in and of itself, does not render the arbitral award unenforceable. Nor does it mean that a U.S. claim must be available. As we have explained, simply because a foreign arbitral award provides for a smaller recovery than may have been available under United States maritime law does not necessarily mean the award violates public policy. See Lindo, 652 F.3d at 1283–87.

Cvoro argues that her case is distinguishable from Lindo and other similar precedent because she did not receive merely a smaller recovery in arbitration, she

was awarded no recovery at all.  That is not entirely correct.  The arbitral award does not represent the sum total of Carnival's obligations to Cvoro, nor is it an accounting of monetary benefits that Cvoro received from Carnival for her carpal tunnel syndrome.  To be sure, in the arbitration, Cvoro initially brought a separate claim for maintenance and cure.  But Cvoro later agreed that Carnival had, in fact, complied with its maintenance and cure obligations under Panamanian law, including paying for her medical bills, room and board, and living expenses while under medical care.  As a result, Cvoro dropped this maintenance and cure claim in her arbitration, as it was no longer necessary or valid.

In this regard, Cvoro obtained many of the benefits to which she would be entitled under U.S. law: Carnival treated Cvoro's carpal tunnel syndrome after it manifested in March 2013, repatriated Cvoro home to Serbia, arranged for continued medical care, and paid for ongoing maintenance and cure during her recovery to the point when her physician declared her to have reached maximum medical improvement in June 2014.  As such, Cvoro's contention that Panamanian law did not afford her any remedy for her injuries is unavailing.  Although not listed in the final arbitral award, Carnival paid for Cvoro's full maintenance and cure benefits.

Furthermore, Panamanian law itself provides Cvoro, as a seaman, with additional remedies that she never pursued in arbitration.  First, Panamanian law

24

provides a seafarer who was injured aboard a vessel with an action for the negligence of a shipowner, including for negligently referring a seaman to a physician. Cvoro did not pursue this claim because she "ha[d] no affirmative proof that [Carnival] acted negligently other than simply choosing the physician in this case."

Second, Panamanian law also provides a seafarer who suffers an incapacity or disability with a claim related to disability compensation for any occupational injury or illness irrespective of fault. Cvoro did not pursue this remedy either. We recognize that the arbitrator found that Cvoro would not be entitled to those disability benefits because her claim was based solely on the medical negligence of the shore-side physicians. In particular, the arbitrator reasoned that, under Panamanian law, Carnival would not be obligated to pay disability in connection with this "new" injury sustained after she signed off the ship, as such disability claims must be based on an "occupational hazard" while onboard the Carnival Dream. But significantly, Cvoro never sought disability benefits at all, including benefits based on the wrist injuries she developed while working onboard the Carnival Dream and before the surgery.

And third, to the extent that Cvoro now argues that she did not reach maximum medical improvement in June 2014 and has unmet medical needs that Carnival should pay for, Cvoro did not advance this position during arbitration

either.  To the contrary, she dropped her maintenance and cure claim, conceding that Carnival had complied with its obligation to pay for her medical bills.  Given these potential avenues for recovery under Panamanian law and Cvoro's failure to fully employ them, we cannot say that the remedies available to her were so inadequate as to render the arbitration proceedings and arbitral award fundamentally unfair.

The primary relevant distinction between Panamanian and U.S. law is that Panamanian law does not recognize a claim that Carnival was vicariously liable for the negligence of the shore-side physicians that it selected to treat Cvoro, whereas U.S. law does.  Cvoro contends that enforcement of the arbitral award violates the public policy of the United States because the arbitrator deprived her of this Jones Act remedy.

The problem for Cvoro is that the arbitral award here was not so inadequate as to violate this nation's "most basic notions of morality and justice."  See Inversiones y Procesadora, 921 F.3d at 1306.  The record does not show that Carnival took advantage of Cvoro in its handling of her injuries or otherwise saddled her with maintenance and cure expenses.  Instead, the evidence shows that Carnival promptly treated Cvoro's wrist condition, took her off duty when the treatment did not work, and repatriated her home to Serbia while continuing to provide her with maintenance and cure benefits until she reached maximum

26

medical improvement for what was ultimately diagnosed to be carpal tunnel syndrome. Moreover, Cvoro does not claim that Carnival was negligent in hiring the Serbian doctors who continued to treat her carpal tunnel syndrome and, in fact, admits that Carnival was not negligent in hiring the specific Serbian doctor who performed surgery on her wrist.[3]

At bottom, Cvoro's argument that we must refuse to enforce the award because she was deprived of a statutory remedy against Carnival is precisely the same argument that we rejected in Lipcon. Lipcon, 148 F.3d at 1297 ("We have little doubt that the United States securities laws would provide [appellants] with a greater variety of defendants and a greater chance of success due to lighter scienter and causation requirements . . . . We will not invalidate choice clauses, however, simply because the remedies available in the contractually chosen forum are less favorable than those available in the courts of the United States.") (alterations in original) (internal quotations and citations omitted). As in Lipcon, here, we may not refuse to enforce the arbitral award simply because the remedies available under Panamanian law are less favorable to Cvoro than the remedies available

---

[3]Cvoro concedes that claiming that Carnival was negligent in selecting the Serbian doctor who performed her surgery would have been frivolous based on documents produced by Carnival, which establish: (1) the doctor graduated from a major urban medical school in Yugoslavia in 1976; (2) after completing a three-year internship, the doctor passed his specialized exams in plastic and reconstructive surgery, which are the European equivalent to board certification; and (3) the doctor received additional training at a university hospital in Yugoslavia and Germany before returning to Serbia where he was a practicing surgeon for over 20 years prior to the subject incident.

27

under U.S. law.  And, as detailed above, the remedies available to Cvoro under Panamanian law are not "so inadequate that enforcement would be fundamentally unfair."  Id.

### D.    Mitsubishi Motors Does Not Help Cvoro

Contrary to Cvoro's assertion, the Supreme Court in Mitsubishi Motors did not establish that a public policy violation has occurred under the Convention when a party is deprived of a federal statutory claim in arbitration.  Cvoro's argument is based on dictum from a footnote in Mitsubishi Motors, from which the "prospective waiver doctrine" originated.

In Mitsubishi Motors, the Supreme Court deemed enforceable an arbitration clause requiring the parties to arbitrate antitrust claims arising from the Sherman Act in Japan.  473 U.S. at 616–24, 628–29, 105 S. Ct. at 3348–52, 3354–55.  The Court held that a party is bound by its agreement to arbitrate U.S. statutory claims unless Congress has precluded arbitration as to that subject matter.  Id. at 627–28, 105 S. Ct. at 3354–55.  Even though it was clear in that case that U.S. law would apply to the antitrust claims during arbitration, in a footnote, the Supreme Court noted a willingness to condemn, on "public policy" grounds, an arbitration agreement that has "choice-of-forum and choice-of-law clauses [that] operate[] in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations."  Id. at 637 n.19, 105 S. Ct. at 3359 n.19.  But because the

28

arbitral panel had taken under submission the antitrust claims—due to an agreement by the parties that U.S. law would apply—the Supreme Court emphasized that, "at this stage in the proceedings," it had "no occasion to speculate" on whether the arbitration agreement's potential deprivation of a claimant's right to pursue federal remedies may render that agreement unenforceable.  Id.  The Court also declined to consider "the effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action on the claimant's capacity to reinitiate suit in federal court."  Id.

In subsequent cases, the Supreme Court has asserted the existence of this "prospective waiver" doctrine, but the Court has never invoked it to justify the refusal to enforce an arbitration clause in either the domestic or foreign arbitration context.  See, e.g., Am. Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 235, 133 S. Ct. 2304, 2310 (2013); Sky Reefer, 515 U.S. at 540, 115 S. Ct. at 2330; see also Suazo, 822 F.3d at 548.

The Supreme Court in Sky Reefer declined to apply the "prospective waiver" doctrine, noting that it was premature to do so since arbitration had not yet taken place, and it was unclear what law the arbitrator would apply or whether the plaintiff would receive "diminished protection as a result" of the application of that law.  Sky Reefer, 515 U.S. at 540, 115 S. Ct. at 2329–30.  Because, at that point, the respondents sought only to enforce the arbitration agreement, the Court noted

29

there would be an opportunity for later review of the arbitral award in federal court.  Id.  In other words, the district court would have the opportunity at the award-enforcement stage to address public policy concerns.  Id.  The Sky Reefer Court suggested, "[w]ere there no subsequent opportunity for review and were we persuaded that 'the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies,'" the Court could perhaps condemn an arbitration agreement as being void as against public policy.  Id. at 540, 115 S. Ct. at 2330 (quoting Mitsubishi Motors, 473 U.S. at 637 n.19, 105 S. Ct. at 3359 n.19).  But because there was an opportunity for review at the award-enforcement stage, it was premature to make findings on whether foreign-law remedies would be inadequate.  See Lindo, 652 F.3d at 1279.

Of course, here, Cvoro has already engaged in arbitration and the district court had the opportunity to review the foreign arbitral award.  So it is not premature at this point to consider Cvoro's prospective-waiver argument.

Importantly though, following its decision in Sky Reefer, the Supreme Court limited the import of the "prospective waiver" language in Mitsubishi Motors to dicta, making plain that "Mitsubishi Motors did not hold that federal statutory claims are subject to arbitration so long as the claimant may effectively vindicate his rights in the arbitral forum."  Italian Colors Rest., 570 U.S. at 235 n.2, 133 S. Ct. at 2310 n.2 (emphasis added).  Id.  Nonetheless, because the Supreme Court

30

has suggested that an arbitral agreement could perhaps contravene public policy if the combination of choice-of-forum and choice-of-law clauses work together as a prospective waiver of a party's rights to pursue statutory remedies, we discuss the issue here. Ultimately, that analysis leads us back to our decisions in Lipcon and Lindo.

We first assume, without deciding, that Cvoro's Jones Act claim is a statutory remedy, since Mitsubishi Motors and its progeny spoke of only the potential prospective waiver of a right to pursue statutory remedies. Next, we consider whether the choice-of-forum and choice-of-law clauses in the seafarer's agreement in this case operate together as a prospective waiver of Cvoro's statutory remedy, such that the agreement could perhaps be void as against public policy.

In Lipcon, we considered the dicta set forth in Mitsubishi Motors and reached the conclusion that the choice-of-forum and choice-of-law clauses did not contravene public policy, even if the clauses may have worked together as a prospective waiver of the party's statutory remedies. Lipcon, 148 F.3d at 1298. In doing so, we found significant the fact that English law provided adequate remedies to the appellants. Id. at 1298–99. As a result, we agreed with the district court's finding that the choice clauses were enforceable. Id. at 1299.

31

We recognize, though, that <u>Lipcon</u> was not an arbitral-award-enforcement-stage case like this one and therefore was "not subject to the New York Convention's linking of Article V public policy defense to the arbitral award-enforcement stage." <u>Lindo</u>, 652 F.3d at 1269.  However, this Court in <u>Lindo</u> found the decision in <u>Lipcon</u> to be "highly relevant to footnote 19 in <u>Mitsubishi</u>." <u>Id.</u> And while <u>Lindo</u>, like <u>Lipcon</u>, was also an arbitration-agreement-enforcement-stage case (as opposed to an arbitral-award-enforcement-stage case), we alternatively held that even assuming <u>arguendo</u> that Article V's public-policy defense could apply at that earlier stage, Lindo's challenge to the arbitration agreement—that it was void as against public policy because he would be prevented from asserting his Jones Act claim under Bahamian law—would still fail. <u>Id.</u> at 1283–84.

Indeed, this Court concluded that the fact that Lindo asserted a Jones Act claim did "not affect the strong presumption in favor of enforcement of the choice clauses in [the seafarer's agreement]." <u>Id.</u> at 1276 (citing <u>Mitsubishi Motors</u>, 473 U.S. at 626, 105 S. Ct. at 3354 ("There is no reason to depart from" the strong presumption of enforceability "where a party bound by an arbitration agreement raises claims founded on statutory rights.").  And we rejected Lindo's challenge to the arbitration agreement as being void as against public policy because he would be prevented from asserting his Jones Act claim under Bahamian law. <u>Id.</u> at 1283–

32

84.  There, we relied on our decision in Lipcon and compared the remedies available under Bahamian law and U.S. law, ultimately finding that Lindo did not show that international arbitration under Bahamian negligence law would provide an inadequate remedy such that enforcement of the arbitration agreement would be "fundamentally unfair." Id.

Applying that reasoning here, we find under our current precedent, the question of prospective waiver of a party's Jones Act claim collapses into our examination of whether choice clauses in arbitration agreements render remedies so inadequate that enforcement of those clauses would be fundamentally unfair. And in making this determination, we compare the remedies available under the law chosen in the arbitration agreement and U.S. law.  For the reasons already discussed, we find the remedies available to Cvoro under Panamanian law are not "so inadequate that enforcement would be fundamentally unfair." See Lipcon, 148 F.3d at 1297.  Accordingly, Cvoro's prospective-waiver argument fails.

Ultimately, at this arbitration-award-enforcement stage, the test for whether a court should refuse to enforce a foreign arbitral award based on public policy is not whether the claimant was provided with all of her statutory rights under U.S. law during arbitration.  Italian Colors Rest., 570 U.S. at 235 n.2, 133 S. Ct. at 2310 n.2.  Rather, the public-policy defense "applies only when confirmation or enforcement of a foreign arbitration award would violate the forum state's most

33

basic notions of morality and justice." <u>Inversiones y Procesadora</u>, 921 F.3d at 1306.  Cvoro has not made that showing here.  Under the totality of the specific facts of this case, enforcing the arbitral award does not violate our "most basic notions of morality and justice." <u>Id.</u>

## VI.  CONCLUSION

For the foregoing reasons, despite Cvoro's status as a ward of admiralty, she has not established that the foreign arbitral award in this case offends the United States' "most basic notions of morality and justice."  We therefore conclude that the district court did not err in denying Cvoro's request that it refuse to enforce the arbitral award and dismissing her claims brought under the Jones Act and general maritime law.

**AFFIRMED.**

34